# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1651 | **DATE** | 6/27/2001 |
| **CASE TITLE** | Talmitch Jackson vs. Chicago Firefighters Union Local #2, ALF-CIO-CLC | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. Defendant's motion for summary judgment [22-1] is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| ✓ | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

2
number of notices

**JUN 2 8 2001**
date docketed

docketing deputy initials

6/27/2001
date mailed notice

Document Number

CR-1
FILED FOR DOCKETING
01 JUN 27 PM 5: 02

IS
courtroom deputy's initials

Date/time received in central Clerk's Office

IS
mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TALMITCH JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 99 C 1651 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| CHICAGO FIREFIGHTERS UNION | ) | |
| LOCAL #2, AFL-CIO-CLC, | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED
JUN 2 8 2001

## MEMORANDUM OPINION AND ORDER

Plaintiff, Talmitch Jackson, filed suit against Defendant, Chicago Firefighters Union Local #2, alleging that Defendant failed to pursue Plaintiff's grievances and thereby constructively discharged him in violation of Title VII of the Civil Rights Act of 1964.[1] Presently before this Court is Defendant's Motion for Summary Judgement, in which Defendant attacks Plaintiff's claims of racial discrimination and constructive discharge on both procedural and substantive grounds. For the following reasons, this Court grants Defendant's motion.[2]

---

[1] Because all events in this case antedate the enactment of the Civil Rights Act of 1991, the Civil Rights Act of 1964 governs this dispute. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 293 (1994).

[2] The parties have consented to have this Court conduct any and all proceedings, including the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(b).



# I.  **Background**

The story begins in February 1987.[3]  At the time, Plaintiff accepted a position with the Chicago Fire Department (the "CFD") as a firefighter while his application for admission to law school was pending.  Plaintiff intended on attending law school as a full-time student and tailoring his full-time position as a firefighter around that schedule whenever possible.  A typical firefighter worked twenty-four hours on duty then had forty-eight hours off; classes for law school would run Monday through Friday beginning August 1987.

The firefighter position entailed a one-year probationary period.  The period commenced with training at the fire academy and would continue during ensuing assignments.  At the end of the probationary period, the firefighter would receive certain rights and privileges.

It was at the fire academy that Plaintiff first inquired about receiving time off to attend law school.  A supervisor told Plaintiff to speak to Captain Burns; this somehow led Plaintiff to propose a plan to Chief Malik.  In exchange for permission to attend class during work hours, Plaintiff would surrender vacation time, switch workdays, take educational leave of absence, or agree to any combination of the aforementioned to receive time off.  (*See* Pl.'s Ex. 11.)  Malik denied the request, telling Plaintiff, "[I]f you want to go to law school, why don't you just quit." (Pl.'s Ex. 6 at 2.)  Other requests were also denied.

Sometime after May 1987, upon graduating from the fire academy, the CFD assigned Plaintiff to Engine Company 7 as a firefighter on the second platoon.  Plaintiff was the only

---

[3]  The following facts are either uncontroverted or related in the light most favorable to Plaintiff, the nonmoving party.  Because Defendant failed to respond to Plaintiff's Rule 56.1(b)(3)(B) Statement of Additional Facts, the facts set forth therein are deemed admitted for purposes of this motion.  *See* Local R. 56.1(a).

Black firefighter at that location. His supervisors were Captain Porter and Chief Gnoit, among others.

We discern that Plaintiff began experiencing problems at Engine Company 7 sometime in August 1987. Around that time Plaintiff started suffering from foot pain because of his fire shoes. He told Gnoit about the problem and asked for permission to wear alternate shoes while on duty. After all, Plaintiff had seen White firefighters wearing alternate shoes while on duty.

Gnoit made a mockery out of Plaintiff's request. Gnoit then narrated the request to others outside Engine Company 7, which Plaintiff deemed unnecessary. Plaintiff felt that the problem could have been easily remedied without informing the chief.

Soon after, Plaintiff visited two podiatrists at the direction of Plaintiff's supervisors. In Chief Tully's presence, the CFD's podiatrist suggested that Plaintiff wear alternate shoes while on duty. Nevertheless, Gnoit prohibited Plaintiff from wearing alternate shoes.

This prompted Plaintiff to contact Lieutenant O'Neill, who was Defendant's business agent in the Second District -- the district in which Engine Company 7 was located.[4] Plaintiff informed O'Neill not only about the disparate treatment between White and Black firefighters with regard to wearing alternate shoes, but also about the disparate treatment between White and Black firefighters with regard to receiving time off for educational purposes -- Plaintiff heard of other White firefighters who had received time off to attend law school.

---

[4] Defendant was the exclusive collective bargaining representative for all full-time uniformed CFD firefighters below the ranks of Deputy District Chief and EMS District Commander.

Next, Plaintiff conveyed his intention to document everything that was happening to him at Engine Company 7. In response, O'Neill opined that documentation could be helpful in the event of a dispute. Before the end of the meeting, O'Neill promised to look into Plaintiff's concerns, but Plaintiff filed no grievance with Defendant at the time.[5]

On September 10, 1987, Plaintiff sent a letter to Chief Moriarity asking for special consideration to allow for continuing education. (*See* Pl.'s Ex. 12.) By this time, Plaintiff was missing class due to his work schedule despite switching his status from day to evening student at the law school. Moriarity denied the request. He commented, "[Y]ou need to either go to law school or quit." (Pl.'s Ex. 6 at 2.)

O'Neill recalled one firefighter in the 1960s receiving time off from work to attend school. He also knew of another firefighter who received time off for the same reason. O'Neill could not, however, remember what the firefighters were studying or how much time off they received. Michael Mayfield, who worked as a paramedic for the CFD from 1975 to 1998, attended law school from 1982 to 1986 as a night student. If he had a conflict between his work and school schedules, Mayfield would try to find someone of equal rank to cover for him at work while he attended class. If he succeeded, Mayfield's supervisors had no problem with the arrangement.

---

[5] The grievance procedure stated that an

employee, with or without the Steward, shall take up the grievance or dispute in writing or orally with the Employer's authorized representative within ten days of its occurrence, or if later, the date on which either the employee or his Union Steward knew or reasonably should have known of its occurrence.

(Pl.'s Ex. 8 at 31.)

In October 1987, Plaintiff began making complaints of excessive drinking and racial slurs at Engine Company 7. Plaintiff encountered this conduct while on duty on numerous occasions. After making one of the complaints, someone stole Plaintiff's fire clothing. He was subsequently sent home and documented as being AWOL in a disciplinary report. Although Plaintiff requested assistance from Defendant regarding this matter, Defendant apparently took no action.

On October 28, 1987, a supervisor at Engine Company 7 ordered paramedics to transport Plaintiff to the hospital via ambulance after Plaintiff complained of foot pain. The foot pain resulted from Plaintiff's fire shoes. Plaintiff considered this treatment inappropriate and unnecessary. He believed it was done solely to embarrass and harass him. Furthermore, for some reason, he believed that Defendant had something to do with it.

Over the next six months Plaintiff continued to endure the excessive drinking and racial slurs, as well as what he considered unfair treatment. For example, Porter required Plaintiff to pay full price to eat at the firehouse despite Plaintiff's being a strict vegetarian and not eating many of the foods offered. All the while Plaintiff continued missing class because he could not obtain leave to attend law school albeit making numerous requests for permission.

Finally, on April 6, 1988, the CFD granted Plaintiff's request for a thirty-day leave of absence for educational purposes. At the time, Plaintiff was no longer a probationary employee. Five days later O'Neill drafted a grievance on behalf of Plaintiff regarding the ambulance incident. (*See* Def.'s Ex. 2.) The grievance stated that Plaintiff was transported to the hospital by ambulance on October 30, 1987, because of foot pain, and that two doctors concluded that Plaintiff's fire shoes caused the pain. The grievance also indicated that Tully ordered Plaintiff to obtain a medical opinion, but that the CFD would not pay the bill. The grievance, however, did

not mention that the ambulance trip was unnecessary and done to harass Plaintiff. For that reason, Plaintiff refused to sign the grievance.

Upon returning from the thirty-day leave of absence, the CFD tested Plaintiff for drugs and alcohol. Plaintiff initially opposed taking both tests because he thought that reinstated firefighters were not required to be tested; but after being told that his reinstatement was dependent on taking the tests, Plaintiff complied. Later, to Plaintiff's surprise, he was told to report to the fire academy for training.

When he arrived at the fire academy, Plaintiff inquired as to why he was not fully reinstated to his regular position. The collective bargaining agreement stated that "[a]n employee returning from a leave of three months or less shall be fully restored to his or her position." (Pl.'s Ex. 8 at 23.) Burns replied, "You made some people in high places mad. I think you are going to be here for a little while." (Pl.'s Ex. 6 at 4.)

While at the fire academy, Plaintiff was treated like a firefighter candidate rather than a firefighter -- for example, he had to climb ladders, take certain tests, etc. Plaintiff observed that White firefighters who were also being reinstated did not have to participate in such exercises or take such tests. Again Plaintiff sought assistance from O'Neill, asking O'Neill to intervene and obtain a transfer to Engine Company 7. On May 18, 1988, Plaintiff and one of Defendant's representatives filed a grievance over the incident. (*See* Def.'s Ex. 3.)

The grievance stated that Plaintiff was granted a leave of absence for educational purposes and that Plaintiff should have been fully reinstated upon his return pursuant to article VIII of the labor contract between Defendant and the CFD. Further, the grievance requested that Plaintiff be made whole, in part by returning him to Engine Company 7. Although admitting to

writing and signing the grievance, Plaintiff stated that he wrote the grievance as instructed by Defendant's representative. According to Plaintiff, this explains why the grievance contains no reference to racial discrimination or harassment. (*See* Pl.'s Local Rule 56.1 Statement of Material Facts ¶ 62.)

Within days of receiving the grievance, O'Neill instructed Norman Holland, Defendant's Director of Contract Enforcement, to "talk to someone to get [Plaintiff] back to [Engine Company 7] as soon as possible." (Def.'s Dep. Ex. 2.) That same day O'Neill also contacted Chief Sterling about the situation. Sterling said that he did not know why Plaintiff was assigned to the fire academy. (*See* Def.'s Dep. Ex. 1.) After some discussion, Sterling opined that Plaintiff could have been sent to the academy to determine if he could wear fire shoes without pain. (*See id.*)

Seven days after O'Neill raised the issue with the CFD, the CFD removed Plaintiff from the fire academy and returned him to Engine Company 7. In total, Plaintiff spent two weeks at the fire academy. Plaintiff received no other relief from either Defendant or the CFD.

When he returned to Engine Company 7, Plaintiff discovered that Porter had written a disciplinary report on Plaintiff for being AWOL on May 16, 1988. Even though Plaintiff explained to Porter that on May 16 Plaintiff was ordered to attend class at the fire academy, Porter did not remove the disciplinary report from Plaintiff's file.

Increased tension between Plaintiff and Porter was not the only matter of concern. Since returning from the fire academy, other firefighters began to harass Plaintiff more frequently. On June 24 Plaintiff noticed that someone had padlocked the refrigerator where he kept his food.

Plaintiff removed the hinges on the door to retrieve his food, and later that evening someone stole Plaintiff's food containers. Porter told Plaintiff to reinstall the hinges and to discontinue placing food items in the refrigerator -- only food club members could use that area. Porter told Plaintiff to store his food in his clothing locker.

At a June 27 firehouse meeting, Plaintiff raised the issues of excessive drinking and racial slurs at Engine Company 7. No action was taken by Porter nor anyone else at the CFD. This placed Plaintiff in a quandary: prior to this date O'Neill told Plaintiff that his concerns about excessive drinking and racial slurs were not grievable issues.

Not surprisingly, the harassment continued. For instance, while responding to an emergency call on June 30, 1988, Plaintiff discovered that someone had filled his fire boots with several inches of urine. Plaintiff told Porter about the incident and requested that the proper authorities be notified. Upon Porter's refusal, Plaintiff threatened to contact the Internal Auditing Division himself. Porter responded, "[I]f you do that you will be putting everyone under scrutiny." (Pl.'s Ex. 6 at 17-18.) After Porter assured Plaintiff that the conduct would not reoccur, Plaintiff chose not to place the call.

On July 12 Porter told Plaintiff to wash dishes left by food club members; Plaintiff was not a member of the food club. On July 15 Porter ordered Plaintiff to man the sounder while everyone else ate, and restricted Plaintiff from using the civil defense room -- a place where Plaintiff would typically read while on duty. Also on July 15 Porter told Plaintiff to "get out" if he did not like what was going on. (*Id.* at 20.) When Porter made this statement, Porter handed Plaintiff his check, a blank transfer form, and a list of vacancies. Plaintiff tried to return the form and list, but Porter refused to accept them.

On July 19, 1988, O'Neill sent a letter to Plaintiff informing him that the CFD denied the May grievance, and instructing Plaintiff to attend a grievance committee meeting on July 26, 1988, to discuss his case. At the meeting, the grievance committee decided not to pursue arbitration. The committee determined that "there was no harm done to [Plaintiff] because he was restored to [Engine Company 7] after spen[ding] two weeks at the academy." (Def.'s Dep. Ex. 5.) The committee stated that the CFD's actions toward Plaintiff were "bewildering but not fatal enough." (Def.'s Dep. Ex. 4 at 4.) This was conveyed to Plaintiff in a letter sent by Holland on July 28, 1988. (*See id.* at 3-4.)

On July 30 someone wrote "stoolie" with a diagonal line through it on the blackboard at Engine Company 7; on August 5 someone placed urine in Plaintiff's fire boots; on August 14 someone tampered with Plaintiff's food. Plaintiff apprised Chief Mall, Gnoit, and Porter of these and other events at a July meeting. Again no action was taken.

In August 1998 Plaintiff sent a twenty-eight page document to Jerry Jones, the CFD's affirmative action officer, and O'Neill, which detailed the treatment Plaintiff received during his employ at Engine Company 7. In response, the CFD suggested that Plaintiff accept a transfer to another fire station. Plaintiff agreed, but only if the CFD removed all of the alleged false disciplinary reports from his file.

A short time later Plaintiff was transferred. While at the new station, however, Plaintiff discovered that none of the disciplinary reports had been removed. This, along with the telephone message "Nigger, I bet you glad you left here" and at least one suspension pending due to the alleged false disciplinary reports, triggered Plaintiff to seek other employment. (Pl.'s Local

Rule 56.1 Statement of Material Facts ¶¶ 94-95.) Plaintiff felt that inevitably he would be unfairly terminated because of his race. On November 8, 1988, Plaintiff resigned, and then accepted a position with the Chicago Police Department.

Months later Plaintiff decided to take his case to the Illinois Department of Human Rights and the Equal Employment Opportunity Commission to obtain redress against Defendant for the discriminatory and inequitable treatment Plaintiff received while at Engine Company 7. On April 12, 1989, Plaintiff filed a charge with the Illinois Department of Human Rights alleging that Plaintiff was denied proper representation because of his race.[6]

The Illinois Department of Human Rights investigated the charge and found substantial evidence of racial discrimination. (As an aside, sometime during the investigation, a videotape was discovered depicting some of Defendant's agents and some of the CFD's firefighters drinking

---

[6] The EEOC charge reads:

    I.     From the middle or late 1987 until November 1998, I was denied proper representation. I was a member in good standing since 1987.

    II.

    III.    I believe I have been discriminated against because of my race, black, in that:

          A.     Whenever I sought help from Respondent, it was denied to me.

          B.     When white members such as Bill Kotawitz placed grievances, they were always properly represented.

(Pl.'s Ex. 9.) Plaintiff checked the box indicating that the cause of discrimination was race. (*See id.*)

and using racial slurs at a party.)[7] The EEOC issued Plaintiff a right to sue letter on December 9, 1998, and pursuant to that letter Plaintiff timely initiated this lawsuit.

## II.  **Discussion**

### A.  **Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the nonmoving party." *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 905 (7th Cir. 1990). In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the nonmoving party. *See Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 883 (7th Cir. 1998).

In cases where the nonmoving party bears the burden of proof at trial, the moving party bears the initial burden of demonstrating that there is no evidence to support the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Provided that burden is met, the nonmoving party must show that evidence establishes the existence of each element essential to his case. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex Corp.*, 477 U.S. at 322).

---

[7] The connection between the videotape and the investigation or this lawsuit is unclear. (*See* Pl.'s Local Rule 56.1 Statement of Material Facts ¶¶ 103-06.)

## B.    Scope of the EEOC Charge

Defendant first challenges Plaintiff's claim of constructive discharge on the ground that it is not encompassed within the scope of the EEOC charge.  As a general rule, a Title VII plaintiff cannot bring claims in federal court that were not included in the EEOC charge.  *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974); *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994).  The rule promotes the investigatory and conciliatory role of the EEOC and alerts the charged party of the conduct complained of by the charging party.  *See Babrocky v. Jewel Food Co.*, 773 F.2d 857, 863 (7th Cir. 1985).

Considering that EEOC charges are commonly drafted by laymen unassisted by lawyers, the test to determine whether a federal claim is encompassed in the EEOC charge affords the Title VII plaintiff significant leeway:  a federal claim is included in the EEOC charge if (1) it is like or reasonably related to the allegations of the charge and (2) the claim can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge.  *See Cheek*, 31 F.3d at 500; *Winters v. Prudential-Bache Sec., Inc.*, 608 F. Supp. 751, 754 (N.D. Ill. 1984) ("[C]ourts should be solicitous of plaintiffs who, while in district court are represented by counsel, completed the EEOC charge without legal aid.").  At a minimum, this means that the allegations in the EEOC charge and the federal complaint must "describe the same conduct and implicate the same individuals." *Cheek*, 31 F.3d at 501.

Moreover, a Title VII plaintiff need not allege each and every fact in the EEOC charge that forms the bases of the claims in his federal complaint.  *See id.* at 500.  There is no expectation of thoroughness; a brief factual summary will do.  *See Danner v. Phillips Petroleum Co.*, 447 F.2d 159, 161-62 (5th Cir. 1971).

Applying these principles to this case, we conclude that Plaintiff's EEOC charge does encompass his federal claim of constructive discharge. On his April 12 charge, Plaintiff indicated that the cause of discrimination was based on race, checking off the appropriate box. (*See* Pl.'s Ex. 9.) In the narrative section of the charge, Plaintiff stated that he was denied proper representation by Defendant despite being in good standing. (*See id.*) In support of this allegation, Plaintiff illustrated a pattern of racially discriminatory conduct: whenever Plaintiff sought help from Defendant it was denied to him, while White union members -- e.g., Bill Kotawitz -- always received help from Defendant when they asked for it. (*See id.*)

Plaintiff's constructive discharge claim, albeit a theory not raised in the EEOC charge, is based solely on the facts in the EEOC charge, namely that each time Plaintiff sought help from Defendant, Defendant refused on account of Plaintiff's race. The argument goes that it was Defendant's discriminatory refusal to represent that caused Plaintiff's constructive discharge. (*See* Pl.'s Resp. Def.'s Mot. Summ. J. at 10-12.) As a result, to investigate Plaintiff's charge of discriminatory refusal to represent at the administrative level, was to investigate Plaintiff's federal claim of constructive discharge. In the same regard, to alert Defendant of Plaintiff's charge of discriminatory refusal to represent at the commencement of the administrative proceeding, was to alert Defendant of Plaintiff's federal claim of constructive discharge. The same conduct and same people concern each theory of discrimination. *See, e.g., Rush v. McDonald's Corp.*, 966 F.2d 1104, 1111 (7th Cir. 1992).

For this reason, *Jefferson v. City of Chicago*, No. 97 C 4895, 1999 WL 116223 (N.D. Ill. Feb. 26, 1999), *Montelbano v. Info. Res., Inc.*, No. 96 C 5677, 1998 WL 265105 (N.D. Ill. May 14, 1998), *Kelley v. Pucinski*, No. 96 C 5006, 1998 WL 341819 (N.D. Ill. June 16, 1998),

and *Dardai v. Cook County*, No. 96 C 1526, 1997 WL 160689 (N.D. Ill. Apr. 2, 1997), are

distinguishable. *Jefferson* involved an EEOC charge limited to denied overtime, harassment, and

unsafe working conditions, but the complaint included different discriminatory conduct in the

way of failure to promote and suspension; *Montelbano* concerned an EEOC charge limited to

termination, but the complaint included different discriminatory conduct in the way of

harassment; *Kelley* involved an EEOC charge limited to racial and disability discrimination, but

the complaint expanded to include discrimination based on color; and *Dardai* concerned an

EEOC charge limited to suspension, but the complaint included different discriminatory conduct

in the way of harassment. Here the EEOC charge and complaint both concern racial

discrimination and the theories presented in the complaint are entirely supported by the conduct

alleged in the EEOC charge.


### C.    The 300-Day Rule

Turning to the next procedural matter, we find that Plaintiff is precluded from

complaining about acts that occurred prior to June 15, 1988, pursuant to 42 U.S.C.

§ 2000e-5(e)(1).  In Illinois, an EEOC charge must be filed within 300 days of the alleged

discriminatory act. *See Speer v. Rand McNally & Co.*, 123 F.3d 658, 662 (7th Cir. 1997).

Failure to do so bars litigation of claims arising from that act.  *See id.*; *Koelsch v. Beltone Elecs.

Corp.*, 46 F.3d 705, 707 (7th Cir. 1995); *see also Del. State Coll. v. Ricks*, 449 U.S. 250, 503

(1980) ("The limitations period[] while guaranteeing the protection of the civil rights laws to

those who promptly assert their rights, also protect[s] employers from the burden of defending

claims arising from employment decisions that are long past.").

- 14 -

Plaintiff concedes that some of the acts supporting his federal claims transgress the 300-day rule, but argues that those acts are properly before this Court pursuant to the continuing violation doctrine. The continuing violation doctrine saves otherwise time-barred acts as long as they can be linked to acts occurring within the limitations period as part of one continuous act. *See Place v. Abbott Labs.*, 215 F.3d 803, 807 (7th Cir. 2000). In making this determination, courts consider the subject matter, frequency, and degree of permanence of the alleged acts of discrimination. *See Freeman v. Madison Metro. Sch. Dist.*, 231 F.3d 374, 381 (7th Cir. 2000); *Enright v. Ill. State Police*, 19 F. Supp. 2d 884, 887 (N.D. Ill. 1998).

In terms of permanence, it is axiomatic that a Title VII plaintiff cannot revive stale claims after knowingly or negligently failing to assert his rights. Thus, if at any time outside the limitations period the plaintiff knew or should have known that a particular act was discriminatory and had harmed him, then the continuing violation doctrine does not apply. *See Place*, 215 F.3d at 807 (quoting *Dasgupta v. Univ. of Wis. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir. 1997). Indeed, this is the type of conduct that 42 U.S.C. § 2000e-5(e)(1) aims to prevent.

In this case, Plaintiff's federal complaint is based on Defendant's failure to represent Plaintiff on account of his race. The facts indicate that as early as September 1987 Plaintiff began reporting what he believed were racially discriminatory and harassing incidents. The reports were made to O'Neill, Defendant's agent, concerning events at Engine Company 7.

Plaintiff contends that he did not know nor could he have known that Defendant -- not the CFD -- was discriminating against him until July 28, 1988 -- which falls inside the 300-day limitations period -- because that was when Plaintiff discovered that Defendant's grievance

committee refused to arbitrate the May grievance. (*See* Pl.'s Resp. Def.'s Mot. Summ. J. at 8.) Plaintiff describes Defendant's discrimination against him prior to July 28 as covert rather than open and notorious. In other words, the July 28 letter was Defendant's first overt act of discrimination.

The argument loses all persuasive force on May 18, 1988. On that date, Plaintiff states and Defendant admits that Plaintiff explained to Defendant's representative "the entire situation surrounding [Plaintiff's] leave of absence and . . . the disparate treatment and racial prejudice such treatment engendered"; and that "[a]fter explaining his concerns in full, Plaintiff sought to file a grievance pertaining to those concerns." (Pl.'s Local Rule 56.1 Statement of Material Facts ¶¶ 61-62.) Defendant's representative, however, "instructed Plaintiff as to the appropriate content for such a grievance, omitting any reference to racially disparate treatment." (*Id.* ¶ 62.)

If Plaintiff knew on May 18 that Defendant refused to grieve any complaints of racial discrimination and harassment, then he also knew or should have known at that time that Defendant was engaging in discriminatory conduct. After all, the omission of racially disparate treatment on the May grievance took place after Plaintiff raised similar complaints to Defendant for nine months to no avail. Throughout these nine months excessive drinking and racial slurs continued; the foot problems continued; the inability to receive time off continued; the purported false disciplinary reports continued. All the while Defendant did essentially nothing. Considering this, to say that on May 18 Plaintiff should not have known a discriminatory act had occurred is far-fetched, especially in light of the fact that Defendant omitted racial discrimination and harassment complaints from the grievance.

July 28 bears no significance to the instant dispute. When filed, the May grievance contained no reference to racial discrimination and harassment. Instead, the grievance pertained solely to reinstatement. This means that the grievance committee's July 26 denial was only a denial relating to the reinstatement issue, having nothing to do with matters of racial discrimination and harassment. Otherwise stated, the grievance committee's actions on July 26 or 28 could not have apprised Plaintiff of Defendant's alleged discriminatory conduct. Accordingly, the continuing violation doctrine does not apply to this case and this Court will not consider acts that occurred prior to June 15, 1988.

### D. Plaintiff's Title VII Claims

Even if we considered events occurring prior to June 15, 1988, Plaintiff's claims of racial discrimination and constructive discharge would suffer the same fate. The record is devoid of any fact indicating that Defendant acted with racial animus. Because of Plaintiff's decision to proceed on a disparate treatment theory to support his claims, this is fatal.[8]

To establish a claim of discriminatory refusal to represent against a union under Title VII, a plaintiff must show that the employer violated the collective bargaining agreement between the union and the employer, that the union breached its duty of fair representation by letting the breach go unrepaired, and that the union's breach was motivated by racial animus. *See*

---

[8] A disparate treatment claim requires a showing of racial animus. A disparate impact claim, on the other hand, does not. *See Agosto v. Correctional Officers Benevolent Ass'n*, 107 F. Supp. 2d 294, 305 (S.D.N.Y. 2000) (citing *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 668-69 (1987)). *Goodman* involved a union that followed a policy of refusing to file grievable racial discrimination claims. 482 U.S. at 668-69.

*Greenslade v. Chi. Sun-Times, Inc.*, 112 F.3d 853, 866-67 (7th Cir. 1997); *Catley v. Graphic Communications Int'l Union, Local 277-M*, 982 F. Supp. 1332, 1340 (E.D. Wis. 1997); *cf. Agosto*, 107 F. Supp. 2d at 304-05 (referring to the first element as unnecessary). To establish a claim of constructive discharge against a union under Title VII, a plaintiff must prove that his working conditions were so intolerable that a reasonable person would have been compelled to resign and that the intolerable conditions resulted from racial animus. *See Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 877 (7th Cir. 1999). Racial animus, or intentional discrimination on the basis of race, is a necessary element of either claim.

Under a disparate treatment theory, a plaintiff may establish a showing of racial animus in one of two ways: through direct evidence or through indirect evidence. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Rabinovitz v. Pena*, 89 F.3d 482, 486 (7th Cir. 1996). Direct evidence is "evidence which if believed by the trier of fact will prove the particular fact in question without reliance on inference or presumption." *Noble v. Sheahan*, 132 F. Supp. 2d 626, 633 (N.D. Ill. 2001) (quoting *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997); *Kelley*, 1998 WL 341819, at *2 ("[O]nly the most blatant remarks, evidencing a clear intent to discriminate in the context of the adverse employment decision, constitute direct evidence of discrimination."). While a showing that similarly situated non-Black employees are treated more favorably than a Black plaintiff will suffice to establish indirect evidence of intentional discrimination. *See EEOC v. Foster Wheeler Constructors, Inc.*, No. 98 C 1601, 1999 WL 507191, at *9 (N.D. Ill. July 6, 1999); *Catley*, 982 F. Supp. at 1343; *see also Thompson v. United Transp. Union*, No. 99-2288-JWL, 2000 WL 1929963, at *8 (D. Kan. Dec. 19, 2000).

A liberal reading of Plaintiff's submissions reveals neither direct nor indirect evidence of discrimination. The innocuous and conclusory remark made by O'Neill in response to Plaintiff's concerns about excessive drinking and racial slurs -- that the concerns were not grievable issues -- is insufficient to support even an inference of discriminatory intent. (*See* Pl.'s Local Rule 56.1 Statement of Material Facts ¶ 68.) The remark fails to provide any insight into the actual motivation of O'Neill at the time it was made.

Plaintiff's subjective interpretation that Defendant mocked Plaintiff's efforts to receive equal treatment at Engine Company 7 is also not probative of racial animus. *See Debs v. N.E. Ill. Univ.*, 153 F.3d 390, 397 (7th Cir. 1998) ("An employee's subjective understanding of a comment cannot alone support an inference of age animus.") Defendant's state of mind is important, not what Plaintiff considered Defendant's state of mind to be. *See Christopher v. Motorola, Inc.*, No. 99 C 6532, 2001 WL 293935, at *13-14 (N.D. Ill. Mar. 19, 2001) (finding that subjective beliefs do not even rise to the level of a stray remark).

Finally, the use of racial epithets at the well-publicized, 1990 drinking affair attended by some of Defendant's agents and some of the CFD's firefighters is irrelevant to this case. Discriminatory statements proffered as direct evidence are relevant "only if they are both made by a decisionmaker and related to the employment decision at hand." *Noble*, 132 F. Supp. 2d at 633 (quoting *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 688 (7th Cir. 1998); *see also Gorence v. Eagle Food Ctrs., Inc.*, No 99-2102, 2001 WL 225239 (7th Cir. Mar. 8, 2001). Here, Plaintiff has not presented any evidence linking the 1990 party or anyone there to the instant case in any way. This comes as no surprise. The 1990 party took place months after Plaintiff

resigned from the CFD at some firehouse foreign to Plaintiff. Seemingly, Defendant's agents who were at the party have no connection to this case.

Next, the evidence submitted fails to show that Defendant treated Plaintiff differently than a similarly situated White firefighter (union member) at any time during the relevant time period; therefore, indirect evidence of racial animus is lacking as well. We surmise that Plaintiff contacted O'Neill at least five times between September 1987 and October 1988 seeking assistance on various matters, including obtaining time off to attend school, receiving permission to wear alternate shoes, obtaining reinstatement, and contesting excessive drinking and racial slurs. Until February 1988, Plaintiff made these complaints as a probationary employee.

In response, O'Neill and company took some action regarding the alternate shoes and reinstatement issues, but took no action regarding Plaintiff's complaints of obtaining a leave of absence and of excessive drinking and racial slurs. For all we know, this is the way Defendant treated each and every firefighter during the relevant time period; Plaintiff has failed to present any evidence displaying Defendant's treatment of complaints from other similar firefighters regarding similar issues.

For example, Mayfield received time off to attend school, but he received time off at the CFD level and he was not a probationary employee. Similarly, O'Neill knew of firefighters that received time off to attend school, but again nothing indicates that Defendant had anything to do with it. With regard to Plaintiff's other complaints that Defendant failed to grieve, as discussed, all we know is that Defendant failed to grieve them. Plaintiff offers no evidence that anyone ever had a complaint grieved by Defendant.

As O'Neill acknowledged, Defendant had a duty to ensure that "everyone [received] the same rights." (Pl.'s Local Rule 56.1 Statement of Material Facts ¶ 77.) Based on the record before us, even assuming that Defendant "didn't do anything" to protect Plaintiff's interests, nothing shows that Defendant failed to provide Plaintiff with the same rights as other firefighters.

Hence, the downfall of Plaintiff's case, the critical inquiry in a Title VII case, is that there is no evidence showing that Defendant -- not the CFD -- acted with racial animus. *See Catley,* 982 F. Supp. at 1343. Accordingly, Defendant's Motion for Summary Judgment is granted.

### III. Conclusion

For the reasons stated, Defendant's Motion for Summary Judgment is granted.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

**Dated:** June 27, 2001.

Copies have been mailed to:

LISA KANE, Esq.
120 South LaSalle Street
Suite 1420
Chicago, IL 60603

Attorney for Plaintiff

STEPHEN B. HORWITZ, Esq.
Sugarman & Horwitz
300 West Washington Street
Suite 1112
Chicago, IL 60606-2002

Attorneys for Defendant